FILED
APR - 3 2015
UCDC WP SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KLX INC., a Delaware Corporation,

                                    Plaintiff,

                    - against -

DAVID NISSEN and
JOAN NISSEN,

                                    Defendants.

---

**15 CV 2782**

___ Civ. ___ (   )

**COMPLAINT**

*JUDGE KARAS*

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, KLX INC. ("KLX" or the "Company") by and through its undersigned counsel, files this Complaint against Defendants, DAVID NISSEN and JOAN NISSEN (collectively the "Nissens" or "Defendants"), for injunctive relief and damages, and in support thereof respectfully alleges:

### NATURE OF THE ACTION

This lawsuit is about two employees who stole trade secrets and proprietary information from their now former employer, KLX, and intend to use this information in their new employment with a competitor of KLX.

The Nissens have both breached their Proprietary Rights Agreements, which they signed as a condition of their employment with KLX, and its predecessor in interest B/E Aerospace, Inc. ("B/E Aerospace" or "B/E") and KLX's policies and procedures by, *inter alia*, transferring to their personal e-mail account documents with component designs and KLX's customer, vendor, parts and pricing lists, along with other proprietary information. Worse yet the Nissens

transferred this confidential, proprietary, and trade secret information to their personal email accounts with the apparent intent to use it for the benefit of their new employer, KLX's direct competitor – M3 Technology, LLC ("M3 Tech").

KLX sues the Nissens for breach of contract, misappropriation of trade secrets, breach of their duty of loyalty, and a permanent injunction. This action also seeks a temporary restraining order and preliminary injunctive relief to maintain the *status quo* pending a decision of this Court. Finally, this action seeks damages resulting from the Nissens' actions.

## PARTIES

1.      Plaintiff, KLX is a corporation organized under the laws of the State of Delaware authorized to do business in New York, with its principal place of business in Wellington, Florida. KLX has an office in Cornwall, Orange County, New York, where the Defendants were employed and committed the tortious acts described in this Complaint.

2.      Upon information and belief, Defendant, David Nissen is a resident of Orange County, New York and is otherwise *sui juris*.

3.      Upon information and belief, Defendant, Joan Nissen is a resident of Orange County, New York and is otherwise *sui juris*.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000.

5.      KLX has its principal place of business in Wellington, Florida, and is a Delaware corporation. KLX is therefore deemed to be a citizen of the states of Florida and Delaware for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

6.     David Nissen is a citizen of Orange County, New York and resides at 68 Angola Road, Cornwall, New York 12518.

7.     Joan Nissen is a citizen of Orange County, New York and resides at 68 Angola Road, Cornwall, New York 12518.

8.     Complete diversity exists because Plaintiff is a citizen of states of Florida and Delaware and Defendants are citizens of the state of New York.

9.     David Nissen is subject to the personal jurisdiction of this Court pursuant to C.P.L.R. § 301 and because he caused injury to KLX in this State by virtue of acts committed within and outside of New York and was engaged in the solicitation or service activities within the State of New York.  In addition, David Nissen was and currently is engaged in substantial and not isolated activities within the State of New York.

10.    Joan Nissen is subject to the personal jurisdiction of this Court pursuant to C.P.L.R. § 301 and because she caused injury to KLX in this State by virtue of acts committed within and outside of New York and was engaged in the solicitation or service activities within the State of New York.  In addition, Joan Nissen was and currently is engaged in substantial and not isolated activities within the State of New York.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims herein occurred in and have caused damages in this District.

## GENERAL ALLEGATIONS

### A.    KLX'S EMPLOYMENT OF DAVID NISSEN AND JOAN NISSEN

12.    David Nissen and Joan Nissen previously worked for B/E Aerospace, until the recent spinoff of B/E's Consumables Management Segment ("CMS"), when they became

employees of KLX.

13.      Specifically, on December 15, 2014, B/E and KLX entered into a Separation and Distribution Agreement, whereby B/E spun-off its CMS business and KLX, a new separate, publicly traded company was formed. *See* Separation and Distribution Agreement, attached hereto as **Exhibit A**.

14.      As the result of an Employee Matters Agreement entered into between B/E and KLX as part of the spinoff, the Nissens became employees of KLX and continued to work at KLX's Cornwall, New York location, where they previously worked for B/E. *See* Employee Matters Agreement, attached hereto as **Exhibit B**. Pursuant to the Employee Matters Agreement, B/E assigned to KLX all rights to enforce any obligations agreed to by the Nissens while at B/E, including: "all agreements containing restrictive covenants (including confidentiality, non-competition and non-solicitation provisions) between a member of the B/E Group and a KLX Employee, with such assignment to be effective as of the Distribution Date." *See* Exhibit B, Employee Matters Agreement, Article VII, "Compensation Matters and General Benefit and Employee Matters," Section 8.01.

15.      Moreover, on December 24, 2014, all KLX employees, including the Nissens, were provided with the following Notice to Employees:

> On December 16, 2014, your employment was transferred to KLX Inc. ("KLX"). KLX has adopted and for an interim period will maintain the policies and practices that B/E Aerospace, Inc. had in place. Until further notice, B/E Aerospace, Inc. policies and practices will apply to KLX, including but not limited to the following: the Employee Guide; the **Code of Business Conduct**; the **Proprietary Rights Agreement**; the Export Control Compliance Policy; the U.S. Computer Systems Electronic Communications and Mobile Devices Policy; and the Agreement to Submit to Drug Testing. Also, the acknowledgments that you signed for B/E Aerospace, Inc. for policies and practices will apply to KLX.

*See* Notice to Employees, attached hereto as **Exhibit C** (emphasis).

16.     David Nissen was employed by KLX as a Group Program Manager—a director level position—while Joan Nissen was a Senior Manager of Sales. The Nissens worked closely together while at KLX and are believed to have been married at one time. By virtue of their respective roles, they managed three main Original Equipment Manufacturer ("OEM") market segments: The Boeing Company IMM and EPP Programs ("Boeing"), Middle River Aircraft Systems, a division of GE Aviation ("Middle River"), and Meggitt PLC ("Meggitt"). In the aggregate, these three segments constitute a combined revenue in excess of $40 million for KLX's business.

17.     KLX has invested and continues to invest considerable resources to develop information, methods, and techniques to: (a) identify and negotiate advantageous business ventures with Boeing, Middle River and Meggitt; (b) develop, maintain, and nurture business relationships with these and other entities; (c) learn Boeing, Middle River and Meggitt's business and aerospace needs; (d) develop innovative solutions to satisfy those needs; and (e) set appropriate pricing to attract and maintain Boeing, Middle River and Meggitt projects.

18.     As the Group Program Manager, David Nissen was the face of KLX's Cornwall, New York operations. Mr. Nissen had primary accountability for total sales revenue, profitability, customer requirement prioritization, customer relationship management, overall market segment and program management and performance for Boeing, Middle River and Meggitt.

19.     David Nissen's duties and responsibilities also included, *inter alia*: (1) overall responsibility for KLX's profits and losses relative to the Boeing, Middle River and Meggitt accounts; (2) overseeing multiple program sites and programs for these customers; (3) delivering business performance, growth driving strategy and accountability, meeting and exceeding

customer expectations, and achieving process excellence for this market segment; (4) identifying and executing strategies that achieved short and long-term business growth objectives; (5) being accountable for continuous improvements in strategy and marketing processes, customer management tools and processes, coordinating linkage with KLX's sales, marketing, purchasing, and pricing functions; and (6) reporting directly to KLX's Vice President of Sales Americas, Asia and Major Programs.

20.     As the Senior Manager of Sales, Joan Nissen was responsible for the development and performance of all sales activities in the region, she managed a sales team of fifteen (15) employees and was expected to provide leadership towards the achievement of KLX's sales goals.

21.     Joan Nissen's duties and responsibilities also included, *inter alia*:   (1) taking ownership for the development and performance of her sales team; (2) preparing action plans for herself, and her team, to achieve sales targets; (3) initiating and coordinating the development of action plans to penetrate new markets or identify new business opportunities; (4) conducting a review of all sales representatives to understand training and development needs and to provide insight for the improvement of the sales representatives' sales and activity performance; (5) providing timely feedback to her director regarding performance; (6) assisting David Nissen in supporting strategic customer/agent relationships; (7) resolving customer complaints and issues quickly and effectively; (8) maintaining **detailed** knowledge of the company's products and value added services; (9) preparing sales team forecasts; (10) creating and conducting business proposals and presentations; (11) preparing RFP responses; and (12) attaining monthly, quarterly, and annual sales goals and sales margins.

22.     By virtue of their respective roles at the Company, the Nissens had access to trade secrets and proprietary information including vendor and supplier lists, product and component design specifications, KLX's pricing, margins, project specifications, and key Boeing, Middle River and Meggitt points of contact, as well as agreements between KLX, its clients and vendors.

23.     As the points of contact for Boeing, Middle River and Meggitt, the Nissens received access to both KLX and Boeing, Middle River and Meggitt confidential, proprietary, and trade secret information.  They received specialized training from both KLX and from Boeing, Middle River and Meggitt (by virtue of their employment by KLX).

24.     The most significant materials misappropriated by the Nissens (discussed below), are located in multi-tiered password protected databases and servers (henceforth KLX's "Electronically Stored Information Servers" or "ESI Servers").  In most cases, access to the ESI Servers and these materials is granted only to KLX employees working on the account.

25.     The ESI Servers are accessible solely via the Company intranet or secured Virtual Private Network ("VPN") tunneling.  Measures taken by KLX to protect the ESI Servers and proprietary information from unauthorized access include (but are not limited to):

    i.    Allowing only key employees to have access to this information, and only if they are in a position to support a contract to ensure that requirements are fulfilled.  As such, only a small percentage of KLX employees have access to the information taken by the Nissens on these ESI Servers;

    ii.    The ESI Servers are only available via the Company intranet or VPN after a user's credentials have been validated upon logging on to a local computer or KLX monitored device;

    iii.    Password authentication is required to access the ESI Server via external sockets and SSL 128 bit encryption is employed;

    iv.    Users are required to change their login credentials every 60-90 days.

v.    Passwords must contain a combination of alphanumeric characters and symbols.

26.    The information, methods, and techniques developed by KLX, including, but not limited to, methods employed in developing pricing, identifying key contacts at Boeing, Middle River and Meggitt, and understanding each company's product mix, preferences, needs, and pricing structure, constitute highly confidential, proprietary, and/or trade secret information not generally known in the public domain.

27.    The aforementioned information has significant economic value to KLX and is, or would be, of significant economic value to competitors in the industry.

28.    Accordingly, KLX takes reasonable measures to maintain the secrecy of its confidential, proprietary, and/or trade secret information, including password protection for access to all computer-based applications, physical security measures to protect hard files, firewalls, and by limiting access to confidential, proprietary, or trade secret information to only certain authorized users.

**B.    KLX'S BUSINESS AND LEGITIMATE BUSINESS INTERESTS**

29.    KLX Aerospace Solutions, the division of KLX for which the Nissens worked, is the world's leading distributor of aerospace fasteners and consumables and full-service provider of inventory management solutions for the commercial, business jet, and military markets worldwide.

30.    Through KLX's global facilities network and advanced information technology systems, the company offers unparalleled service to commercial airliners, business jet, and defense original equipment manufacturers (OEMs), airlines, maintenance, repair and overhaul (MRO) operators, and fixed based operators (FBOs).  With a large and diverse global customer base seeking access to over one million part numbers, KLX serves as a distributor for every

major aerospace fastener manufacturer. The Company's system supports both internal distribution processes and part attributes, along with customer services, including Bin Management and Kitting solutions, which are unmatched in the industry. KLX serves virtually all of the world's airlines, aircraft manufacturers, leasing companies, and completion centers through direct sales and customer support organizations.

31.    KLX, and its predecessor B/E, has invested significant resources in establishing and growing its national and international CMS Business. As part of its growth, KLX has expended considerable time, effort and resources in developing and maintaining proprietary and valuable information, including, but not limited to, vendor and supplier lists, product and component design specifications, KLX's pricing, margins, project specifications, and key Boeing, Middle River and Meggitt points of contact, as well as agreements between KLX, its clients and vendors.

32.    David Nissen had access to these trade secrets by virtue of his role as KLX's Cornwall, New York, Group Program Manager.

33.    Joan Nissen had access to these trade secrets by virtue of her role as KLX's Cornwall, New York, Senior Manager of Sales.

## C.    THE NISSENS' AGREEMENT TO MAINTAIN THE CONFIDENTIALITY OF KLX'S PROPRIETARY AND TRADE SECRET INFORMATION

34.    To protect its confidential, proprietary, and trade secret information and in furtherance of its legitimate business interests, KLX also requires the individuals it employs to agree to maintain the confidentiality of this information.

35.    When he first began his employment, David Nissen was required to sign a Proprietary Rights Agreement, which prohibited any direct or indirect disclosure of B/E's (now

KLX's) proprietary and confidential information. *See* Proprietary Rights Agreement for David Nissen attached hereto as **Exhibit D**.

36. Joan Nissen also executed the same Proprietary Rights Agreement. *See* Proprietary Rights Agreement for Joan Nissen attached hereto as **Exhibit E**. (Collectively, the Proprietary Rights Agreements executed by David Nissen and Joan Nissen are referred to as "Agreements" or "PRAs.")

37. In their respective Agreements, the Nissens agreed "to maintain in confidence and...not disclose or use, either during or after the Agreement Period, any **Proprietary Information**." *See* Agreements at § 2 (emphasis in original).

38. "Proprietary Information" as defined in the Agreements includes, but is not limited to the following:

A. KLX's written materials;

B. Names and information relating to customers and prospective customers of KLX and/or persons, firms, corporations or other entities with whom KLX has provided goods or services;

C. The terms of various agreements between KLX and any third parties;

D. Any data or database, trading algorithms or processes, or other information compiled by KLX;

E. All policies, procedures, strategies and techniques regarding the services performed by KLX or regarding the training, marketing and sales of KLX, either oral or written;

F. Any other information, data, know-how or knowledge of a confidential or proprietary nature observed, used, received, conceived or developed by the Nissens in connection with their employment;

G. All non-public information regarding the amount and nature of the capital and assets owned or controlled by, or net worth of, KLX;

H. All discoveries, inventions, research, production processes, software, trademarks, etc., developed or learned by the Nissens while employed by KLX;

I. **Trade Secrets**.

*See* PRAs at ¶¶ 2(i)-2(x) (Exhibit D and Exhibit E).

39.     By executing these Agreements, the Nissens also agreed not to remove any Proprietary Information from KLX without the Company's consent and to return all Proprietary Information prior to their separation of employment:

**Use and Return of Proprietary Information and Trade Secrets:**

(i) I agree that under no circumstance and at no time shall any of the Proprietary Information and Trade Secrets be taken from the Company's premises and that under no circumstances and at no time shall any of the Proprietary Information and Trade Secrets be duplicated, in whole or in part, without the express written permission of the Company, which permission may be granted or denied in the Company's sole and absolute discretion;

(ii) I agree that, upon termination of my employment (if applicable} and/or tenure as an independent contractor with the Company for any reason (regardless of whether or not the Company retains me as a consultant) or at any other time upon the Company's request, I shall return to Company, without retaining any copies, all Proprietary Information and Trade Secrets, as well as all other Company's documents and other materials, which are in my possession regardless of the form in which any such materials are kept;

*See* PRAs at ¶ 4(i)-(ii).

40.     Additionally, the Nissens warranted and represented that they had no rights to any inventions or other confidential or proprietary information prior to their employment with KLX. As such, any information or ideas conceived or learned by the Nissens in the course of their employment, including, but not limited to, any inventions, know-how, strategies and related activities were to remain the property of KLX, as outlined in the Proprietary Rights Agreement, which protects such information from disclosure.

41.     In addition, KLX-/B/E, has a number of policies and procedures in place prohibiting the disclosure of its trade secrets and proprietary information, including, but not limited to, a Code of Business Conduct (attached hereto as **Exhibit F**), which the Nissens initially received and acknowledged during their employment at B/E. *See* Acknowledgment of

Receipt of Code of Business Conduct for D. Nissen, dated February 6, 2012, attached hereto as

**Exhibit G**; Acknowledgment of Receipt of Code of Business Conduct for J. Nissen, dated,

February 6, 2012, attached hereto as **Exhibit H**. The Code clearly explains that as a condition of

employment, the Nissens were required to safeguard KLX-B/E Confidential Information, which

included, but was not limited to "pricing, inventions, financial data, trade secrets and know-how,

acquisition and divestiture opportunities, marketing and sales programs, research and

development information and customer and supplier information," to wit:

> The Company's assets also include confidential and proprietary information
> relating to the present or planned business activities or assets of the Company
> that have not been released publicly by the Company. **Confidential
> information includes, for example, pricing, inventions, financial data, trade
> secrets and know-how, acquisition and divestiture opportunities, marketing
> and sales programs, research and development information and
> customer and supplier information.**
>
> No employee should disclose the Company's confidential or proprietary
> information to anyone within or outside the Company unless the recipient
> legitimately needs the information to carry on his assigned responsibilities as an
> employee with the Company, or is an outsider who has been properly authorized
> by management to receive such information.

*See* Code of Business Conduct, Exhibit F at p. 15 (emphasis).

    42.    There can be no question that the Nissens knew of their obligations to KLX.

**D.    KLX DISCOVERS THAT THE NISSENS STOLE ITS CONFIDENTIAL INFORMATION AND
TRADE SECRETS.**

    43.    In a coordinated effort, the Nissens suddenly resigned their employment at KLX

on February 16, 2015 by separate emails sent to their supervisor, Chuck Robinson, KLX's Vice

President of Sales Americas, Asia and Major Programs. The emails, which were nearly

identical, were sent within one (1) minute of each other and provided less than two weeks' notice

of their intended final day of employment on February 27, 2015. Copies of the Nissens'

resignation letters are attached hereto as **Composite Exhibit I**.

44. Soon after receiving notice of the Nissens' resignations, KLX learned that they had purportedly accepted offers of employment from M3 Tech.

45. The Nissens' new employment with M3 Tech was a red flag, as M3 Tech was a competitor of KLX that could use the confidential and trade secret information about KLX's part pricing, quantity, vendor and distribution channels to compete with KLX and undercut the Company in competitive bidding process.

46. Given that the Nissens had access to this information by virtue of their roles at the Company, KLX reviewed their e-mails.

### 1. David Nissen's Misappropriation of Confidential Information and Trade Secrets

47. KLX's review of David Nissen's KLX e-mail account revealed that he had transferred to his personal e-mail address proprietary information regarding, among other things, KLX's customer lists, pricing information, supplier information, parts information and vendor lists.

48. This review uncovered startling evidence suggesting that David Nissen had planned the misappropriation of trade secrets to occur during the period leading up to his anticipated last day of his employment on February 27, 2015, however it began as early as February 3, 2015—two weeks prior to his resignation.

49. Specifically, KLX determined that on February 3, 2015, David Nissen began forwarding highly confidential e-mails and documents to himself at the e-mail address **nissman624@aol.com**.

50. The first email he forwarded himself on February 3, 2015, at 10:42 AM, contained an Excel Spreadsheet and .pdf file with highly confidential competitive market information regarding KLX's relationship with Boeing. Specifically, the .pdf file which was

entitled, "Amendment_A012_65147-0379 dated 10-28-2014.pdf" was a confidential, proprietary and trade secret document containing the "Special Business Provisions…Between the Boeing Company and [KLX]" which included, among other things, updated Work Statements, Pricing Provisions and Emergent Procurement Program ("EPP") Requirements. It also contained specifics regarding part prices and service fees, which are subject to a Non-Disclosure Agreement between Boeing and KLX. With regard to the Excel Spreadsheet, that document contained part numbers, supplier information, UOP and pricing information that accompanies the agreement. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

51.    On February 5, 2015, at 1:32 PM, David Nissen forwarded to himself an Excel Spreadsheet with highly confidential competitive market information regarding Interturbine, a division of KLX. Interturbine is recognized around the world as an approved supplier of materials such as consumables, chemicals, raw and semi-finished metal products and materials, composites and electrical parts to the aerospace industry, MROs and airlines, consolidating more than 550,000 part numbers and specifications from over 3,300 sources.

52.    On February 5, 2015, David Nissen forwarded to himself an Excel Spreadsheet and accompanying email which included competitive pricing information and pricing structures used to pitch and evaluate deals for Boeing IMM. These particular documents were used to make a "refreshed" offer to Boeing IMM in or around January 2015 and contained information, including, but not limited to, KLX's costs and resale price suggestions; which are based on

KLX's proprietary regional pricing model, historical sales price data and pricing per KLX's Unit of Measure ("UOM"). The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

53.    On February 10, 2015, at 9:31 AM, David Nissen forwarded to himself an Excel Spreadsheet entitled "Master_Exhibit D-11142014_validation copy" and accompanying email which included KLX's entire parts list for quoted and purchased materials for GE Aviation/Middle River. The spreadsheet included Line Number information, Prior Part Numbers, Customer Reference Numbers, Invoiced Parts Numbers, Certified Part Numbers, Quantities, Contract Prices, Estimated Annual Usage, and Actual Annual Usage. The email also included a chain of correspondence between B/E-KLX employees and General Electric Aviation employees discussing, *inter alia*, purchase requirements and lead time availability with target dates extending through October 2015. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

54.    On February 17, 2015, at 2:19 PM, David Nissen forwarded to himself two Excel Spreadsheets entitled "747 Alum Fasteners" and "Shuff 747 Aluminum." These documents contained a list of parts quoted to Boeing in the Integrated Materials Management ("IMM") and

EPP programs and applies to customers who support airframes and thrust reversers manufactured by Middle River Aviation—accounts which the Nissens serviced while at KLX.

55.     These Excel Spreadsheets included information regarding quantities of parts ordered, pricing information, proprietary KLX employee remarks and work product. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

56.     On February 18, 2015, at 12:52 PM, David Nissen forwarded to himself an Excel Spreadsheet entitled "invoice analysis" and e-mails containing a list of parts relative to quoting a Boeing IMM contract. This Excel Spreadsheet contained part numbers, quotes, purchase locations and manufacturing information. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

57.     On February 18, 2015, at 12:53 PM, David Nissen forwarded to himself an e-mail entitled, "Early February SIA EPP Parts to Transition." This document contained an Excel style spreadsheet with information regarding part, quantity, pricing and transition date information for an early February 2015 SIA EPP parts to transition. The information contained in this document was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut

KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

58.     On February 18, 2015, at 12:57 PM, David Nissen forwarded himself an email containing an excel style spreadsheet including pricing, quantity and cost information relative to parts to support Boeing customers. The information contained in this document was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

59.     On February 18, 2015, at 2:16 PM, David Nissen forwarded to himself an e-mail string entitled "Validation Quote for PCA H53 Nacelles." This email contained a confidential and proprietary quote sent by GKN Aerospace (a large airframe subcontractor) to B/E-KLX employees with highly confidential, proprietary, and trade secret information including, but not limited to, part numbers, quantity of aircraft, purchase orders, pricing information, and projected requirements **through 2019.**

60.     The information contained in this e-mail was compiled/developed through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

61.     On February 19, 2015, at 10:28 PM, 10:29 PM, and again on February 20, 2015, at 2:56 PM, David Nissen forward to himself three Excel Spreadsheets and a string of emails regarding parts manufactured and sold by KLX for the Airbus A320.

62.     These spreadsheets included proprietary pricing, quantity, distribution and customer information. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

63.     On February 19, 2015, at 11:28 AM, David Nissen forwarded to himself an email containing pricing, quantity and cost information relative to parts to support the Boeing 747 aircraft. The information contained in this document was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

64.     On February 20, 2015, at 10:42 AM and again at 11:35 AM, David Nissen forwarded to himself two emails containing .txt files entitled "boeing.txt" and "imm.txt," respectively. Of the materials misappropriated by David Nissen these items were two of the most alarming. The files David Nissen forwarded himself on February 20, 2015, at 10:42 AM and again at 11:35 AM contained KLX's "Playbook" for the Boeing EPP and Boing IMM accounts. They included over 50,000 line entries of information regarding each part sold by B/E-KLX beginning in 2012 and contained quintessential trade secret information including: part

numbers, quantities purchased, total price, financial cost information, profit to B/E-KLX, profit margin, booking dates, CNV pricing, and aggregated information for the <u>entire Boeing EPP and Boeing IMM accounts.</u> The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

65. On February 20, 2015, at 2:56 PM, David Nissen forwarded to himself a document containing a quote by Esterline Engineered Materials. This document contained quantity, pricing information for Middle River. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

66. David Nissen had access to his work e-mail account remotely which precluded the necessity of having to send himself any of the above-described trade secrets and other proprietary and confidential information to his personal e-mail account.

67. The documents and e-mails that David Nissen sent to his personal e-mail account were highly sensitive and confidential and include, vendor lists, pricing, cost and volume information.

68. Upon information and belief, the reason David Nissen forwarded KLX's confidential information to his personal account was to transfer this information to his new employer, KLX's competitor - M3 Tech.

**2. Joan Nissen's Misappropriation of Confidential Information and Trade Secrets**

69.     KLX's review of Joan Nissen's KLX e-mail account revealed that she had transferred to her personal e-mail address proprietary information regarding KLX's customer, pricing, and supplier information.

70.     This review uncovered evidence suggesting that Joan Nissen had planned the misappropriation of trade secrets to occur during the period leading up to her anticipated last day of employment on February 27, 2015.

71.     Specifically, KLX determined that on February 12, 2015, Joan Nissen began forwarding highly confidential e-mails and documents to herself at the e-mail address **justj412@aol.com.**

72.     Specifically, on February 12, 2015, at 11:52 AM, Joan Nissen forwarded to herself an email containing information regarding issues with Boeing inventory and discussing various points of contact at the company. This information would give a competitor, like M3 Tech an advantage in negotiations over KLX.

73.     On February 13, 2015, at 12:31 PM, Joan Nissen forwarded to herself an Excel Spreadsheet containing a list of KLX salespeople, the customer accounts they managed, and the types, quantity and value of parts needed by each customer. This spreadsheet essentially contained KLX's playbook for its major accounts and the information contained therein is extremely sensitive, proprietary and confidential. The information contained in these documents was compiled through extraordinary efforts and expense to KLX and a competitor, like M3 Tech, would have an advantage in the marketplace and could undercut KLX's efforts to gain a contract with this information. More alarmingly, if disclosed to the general public, this information would irretrievably damage KLX's business operations and goodwill in the aerospace industry.

74.     Joan Nissen had access to her work e-mail account remotely which precluded the necessity of having to send herself any of the above-described trade secrets and other proprietary and confidential information to her personal e-mail account.

75.     The documents and e-mails that Joan Nissen sent to her personal e-mail account were highly sensitive and confidential and include, customer requirements, points of contact, pricing, cost and volume information.

76.     Upon information and belief, the reason Joan Nissen forwarded KLX's confidential information to her personal account was to transfer this information to her new employer, KLX's competitor - M3 Tech.

E.      **KLX'S PRE-LITIGATION EFFORTS TO RECOVER ITS CONFIDENTIAL INFORMATION AND TRADE SECRET DOCUMENTS AND TO OBTAIN COMPLIANCE WITH THE NISSENS' CONFIDENTIALITY AGREEMENTS**

77.     On March 11, 2015, KLX sent letters to the Nissens demanding the return of all KLX confidential, proprietary, and trade secret information. The letters concluded by demanding that the Nissens preserve all documents in paper or electronic form and not to destroy or spoliate information. *See* March 11, 2015 Demand Letter to David Nissen attached hereto as **Exhibit J**; *See* March 11, 2015 Demand Letter to Joan Nissen attached hereto as **Exhibit K**.

78.     Within forty-eight (48) hours of receiving said letters, the Nissens, and their new employer M3 Tech, retained the law firm of Ruskin Moscou Faltischek, P.C., and specifically attorney Norman R. Cerullo, who requested additional time to "investigate the allegations." *See* Correspondence from N. Cerullo to S. Kessler, dated March 13, 2015, attached hereto as **Exhibit L**.

79.     To date, despite delay tactics couched in a purported desire to resolve the situation "amicably and without resort to litigation" (Exhibit L), the Nissens have failed to return

the materials at issue or adequately address these serious breaches of their Agreements, as well as their violations of New York Law.

80.     Due to the Nissens' wrongful conduct, it was necessary for KLX to retain the undersigned counsel to represent its interest in this action for which KLX will incur costs and expenses, including attorneys' fees, court costs, payment of taxes, etc., which costs and expenses are to be paid by the Nissens.

81.     All conditions precedent to the maintenance of this action have occurred, been satisfied or have otherwise been excused.

**COUNT I – BREACH OF CONTRACT
AGAINST DAVID NISSEN AND JOAN NISSEN**

82.     KLX re-alleges paragraphs 1 through 81 and incorporates them by reference as if fully set forth herein.

83.     KLX (by virtue of B/E's assignment pursuant to the Employee Matters Agreement) and the Nissens are parties to the Proprietary Rights Agreement. *See* Exhibit D and Exhibit E. In addition, the Nissens were bound by KLX's policies and procedures prohibiting the disclosure of the company's trade secrets and proprietary information.

84.     The Proprietary Rights Agreement explicitly prohibits the disclosure of KLX's confidential and proprietary information, and includes a provision wherein the Nissens agreed "to maintain in confidence and … not disclose or use, either during or after the Agreement Period, any **Proprietary Information**." *See* Agreement at § 2 (emphasis in original).

85.     The Proprietary Rights Agreement also prohibited the Nissens from taking any Confidential Information to Trade Secrets without KLX's permission and required them to return any such information at the termination of their employment. *See* Agreements at ¶ 4(i)-(ii).

86.   Upon information and belief, the Nissens have materially breached the Proprietary Rights Agreement and KLX's policy and procedures by taking and disclosing KLX's confidential and proprietary information or know-how to third parties.

87.   KLX has been damaged as a result of this breach in an amount to be established at trial and believed to be in excess of $75,000.

**WHEREFORE,** KLX respectfully requests that the Court enter judgment against David Nissen and Joan Nissen: (i) for compensatory and punitive damages to the extent available under law in favor of KLX; (ii) awarding KLX its reasonable attorneys' fees and costs, all pre-judgment and post-judgment interest; and (iii) awarding any and all other relief this Court deems fair and just.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS AGAINST DAVID NISSEN AND JOAN NISSEN

88.   KLX re-alleges paragraphs 1 through 87 and incorporates them by reference as if fully set forth herein.

89.   This is an action for Misappropriation of Trade Secrets under New York Common Law.

90.   During the course of their employment with KLX, the Nissens had access to and knowledge of KLX's trade secrets and non-public, confidential and proprietary information including, but not limited to. product pricing, quantity, supplier, customer needs and distribution information that KLX invested time, money and skill to develop.

91.   The Nissens, through improper means and in breach of the PRAs, stole this information by sending documents with trade secrets and proprietary confidential information to their personal e-mail accounts.

92.     The Nissens' actions were neither justified nor privileged and they have made no effort to return the confidential and proprietary information they misappropriated.

93.     The Nissens' actions were intentional, willful, wanton, and malicious, for their own personal gain and to the detriment of KLX.

94.     As a result, the Nissens are now in the possession of KLX's trade secrets and confidential and proprietary information.

95.     Upon information and belief, the Nissens misappropriated this confidential and proprietary information with the intent to use it for the benefit of themselves and their new employer, KLX's direct competitor – M3 Tech.

96.     The trade secrets and confidential and proprietary information stolen by the Nissens derive independent economic value from not being known to the public.

97.     KLX took reasonable steps to protect the secrecy of these trade secrets and confidential proprietary information. In fact, this information was maintained under conditions sufficient to preserve its confidentiality including, but not limited to, the use of Proprietary Rights Agreements and other measures designed to prevent the disclosure of this information to third-parties.

98.     As a direct and proximate result of the Nissens misappropriation of trade secrets, KLX has suffered damages in an amount to be determined at trial but believed to be in excess of $75,000.

**WHEREFORE,** KLX respectfully requests that the Court enter judgment against David Nissen and Joan Nissen: (i) for compensatory damages to the full extent available under law in favor of KLX; (ii) awarding KLX its reasonable attorneys' fees and costs, all pre-judgment and post-judgment interest; (iii) awarding KLX punitive damages based on the intentional, willful,

wanton, and malicious conduct of David Nissen and Joan Nissen; and (iv) awarding any and all other relief this Court deems fair and just, including an order compelling the return of any and all documents containing KLX's trade secrets and confidential information.

### COUNT III – BREACH OF DUTY OF LOYALTY AGAINST DAVID NISSEN AND JOAN NISSEN

99.     KLX re-alleges paragraphs 1 through 98 and incorporates them by reference as if fully set forth herein.

100.     Since on or around January 31, 2012, David Nissen was an employee of KLX, or its predecessor in interest, B/E.

101.     Since on or around January 31, 2012, Joan Nissen was an employee of KLX, or its predecessor in interest, B/E.

102.     As an employee, the Nissens owed a duty of loyalty to KLX and were prohibited from acting in a manner inconsistent with their employment relationship with KLX. Further, the Nissens were bound at all times to exercise the utmost good faith and loyalty in the performance of their duties as employees of KLX and to act in KLX's best interest.

103.     The Nissens breached their duty of loyalty by disclosing KLX's confidential information or know-how to third parties.

104.     The Nissens' actions were neither justified nor privileged.

105.     The Nissens' actions were intentional, willful, wanton, and malicious, and for their own personal gain to the detriment of KLX. As a result, punitive damages are appropriate and should be awarded.

106.     KLX has been damaged as a result of the Nissens' wrongful conduct in an amount to be determined at trial.

**WHEREFORE,** KLX respectfully requests that the Court enter judgment against David Nissen and Joan Nissen: (i) for compensatory damages to the full extent available under law in favor of KLX; (ii) awarding KLX its reasonable attorneys' fees and costs, all pre-judgment and post-judgment interest; (iii) awarding KLX punitive damages based on the intentional, willful, wanton, and malicious conduct of David Nissen and Joan Nissen; and (iv) awarding any and all other relief this Court deems fair and just.

### COUNT IV – PERMANENT INJUNCTION
### AGAINST DAVID NISSEN AND JOAN NISSEN

107.    KLX re-alleges paragraphs 1 through 106 and incorporates them by reference as if fully set forth herein.

108.    This is an action for temporary and permanent injunctive relief based on the Nissens' improper conduct.

109.    Due to the Nissens' improper conduct including, but not limited to, the misappropriation of KLX's trade secret and confidential proprietary information and the disclosure of this information to third parties, KLX will suffer irreparable harm in the absence of an injunction.

110.    KLX has no adequate remedy at law that could remedy the disclosure of its trade secrets and proprietary confidential information to its competitors.

111.    Injunctive relief is in the public interest because tort, trade secret and unfair practices law serve to protect standards of commercial morality and encourage invention and innovation while maintaining the public interest in having free and open competition in the service and technology industries.

**WHEREFORE,** KLX respectfully requests that the Court enter a temporary or preliminary injunction, thereafter to be made permanent, against David Nissen and Joan Nissen:

(i) enjoining the Nissens, and any other persons who are in active concert or participation with them or their officers, agents, servants, employees, and attorneys from using, copying, reproducing, disseminating, disturbing, and disclosing the proprietary and valuable information and trade secrets of KLX and all other documents, data and information that they have created using the proprietary and valuable information and trade secrets of KLX; (ii) requiring the Nissens to return all proprietary and valuable information and trade secrets to KLX; (iii) awarding KLX its reasonable attorneys' fees and costs, all pre-judgment and post-judgment interest; and (iv) awarding any and all other relief this Court deems fair and just.

## JURY DEMAND

KLX hereby requests a trial by jury on all issues so triable.

Dated: April 9, 2015

Respectfully submitted,

AKERMAN LLP
666 Fifth Avenue
New York, New York 10103
telephone: (212) 880-3800
facsimile: (212) 880-8965

Michael C. Marsh
Scott M. Kessler
Matthew A. Steinberg
Christopher R. Lepore

ATTORNEYS FOR KLX INC.