## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KLX INC., a Delaware Corporation,

        Plaintiff,

      -against-

DAVID NISSEN and
JOAN NISSEN,

        Defendants.

Civil Action No. 15 Civ. 2782 (KMK)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Michael C. Marsh
   *michael.marsh@akerman.com*
Scott M. Kessler
   *scott.kessler@akerman.com*
Christopher R. Lepore
   *christopher.lepore@akerman.com*
AKERMAN LLP
666 Fifth Avenue, 19th Floor
New York, New York 10103
Tel. (212) 880-3800
Fax (212) 880-8965

ATTORNEYS FOR KLX INC.

Dated:  April 10, 2015
       New York, New York

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

    A. KLX's Business and Legitimate Business Interests ...................................... 6

    B. The Nissens' Agreement to Maintain the Confidentiality of KLX's
       Proprietary and Trade Secret Information .................................................... 7

    C. KLX discovers that the Nissens stole its confidential information and
       trade secrets. ................................................................................................ 10

ARGUMENT ...................................................................................................... 13

    I.    LEGAL STANDARD FOR A PRELIMINARY INJUNCTION AND
          TEMPORARY RESTRAINING ORDER ......................................................... 13

    A. Absent Injunctive Relief, KLX Will Suffer Irreparable Harm ...................... 14

    B. KLX is Likely to Prevail on the Merits ...................................................... 17

       (1)  Defendants Misappropriated Trade Secrets ......................................... 17

           (a)     The Confidential and Proprietary Information Stolen by
                   Defendants are Trade Secrets ..................................................... 18

           (b)     Defendants Misappropriated KLX's Trade Secrets in Direct
                   Violation of the PRAs and their Positions of Trust and
                   Confidence with KLX ................................................................ 21

       (2)  Defendants Breached the PRAs .......................................................... 22

       (3)  Defendants Breached Their Duty of Loyalty to KLX ......................... 23

    C. Alternatively, KLX Raises Sufficiently Serious Questions Going to the
       Merits, and the Balance of Hardships Tips in its Favor ............................... 23

    D. No or Only a Nominal Bond Should Be Required ...................................... 25

CONCLUSION .................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*,
   515 F. Supp. 2d 298 (N.D.N.Y. 2007) ..................................................................23

*Ashland Mgmt. v. Janien*,
   82 N.Y.2d 395 (1993) ............................................................................................18

*Defiance Button Mach. Co. v. C & C Metal Products Corp.*,
   759 F.2d 1053 (2d Cir. 1985).................................................................................20

*Estee Lauder Companies Inc. v. Batra*,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006)..............................................................16, 24

*Fairfield Fin. Mortgage Grp., Inc. v. Luca*,
   No. 06-CV-5962 (JS) (WDW), 2014 WL 4638950 (E.D.N.Y. Sept. 16, 2014)......23

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009)....................................................................................15

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
   730 F.2d 61 (2d Cir. 1984)......................................................................................16

*Four Seasons Hotels & Resorts v. Consorcio Barr*,
   267 F. Supp. 2d 1268 (S.D. Fla. 2003), *aff'd in part, rev. in part*, 138 Fed. Appx. 297
   (11th Cir. 2005)......................................................................................................20

*Frantic, LLC v. Konfino*,
   No. 13 CIV. 4516 AT, 2013 WL 5870211 (S.D.N.Y. Oct. 30, 2013) .....................19

*Gen. Elec. Co. v. Macejka*,
   252 A.D.2d 700, 675 N.Y.S.2d 420 (3d Dep't 1998) ..............................................20

*Hatfield v. AutoNation, Inc.*,
   939 So. 2d 155 (Fla. 4th DCA 2006) ................................................................16, 24

*Ikon Office Solutions, Inc. v. Leichtnam*,
   No. 02-CV-0721E(SC), 2003 WL 251954 (W.D.N.Y. Jan. 3, 2003).......................20

*In Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*,
   2001 WL 1200656 (S.D. Fla. 2001) ........................................................................20

*In re Cross Media Mktg. Corp.*,
   No. 06 CIV. 4228 (MBM), 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006)..........18, 19

*Int'l Bus. Machines Corp. v. Papermaster*,
  No. 08-CV-9078(KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008)................................15

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
  323 F. Supp. 2d 525 (S.D.N.Y. 2004)..................................................................................20

*JonJuan Salon, Inc. v. Acosta*,
  922 So. 2d 1081 (Fla. 4th DCA 2006) .................................................................................16

*Lehman v. Dow Jones & Co.*,
  783 F.2d 285 (2d Cir. 1986)................................................................................................19

*Leibowitz v. Aternity, Inc.*,
  No. 10 CV 2289 (ADS), 2010 WL 2803979 (E.D.N.Y. July 14, 2010).....................14, 16, 17

*Liddle & Robinson, LLP v. Garrett*,
  720 F. Supp. 2d 417 (S.D.N.Y. 2010)..................................................................................22

*Medtech Prods. Inc. v. Ranir, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008)..................................................................................19

*N. Atl. Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999)................................................................................16, 18, 20, 22

*NPA Assocs., LLC v. Lakeside Portfolio Mgmt., LLC*,
  No. 12-23930-CIV, 2014 WL 714812 (S.D. Fla. Feb. 22, 2014)...........................................22

*Otokoyama Co. v. Wine of Japan Imp., Inc.*,
  175 F.3d 266 (2d Cir. 1999)................................................................................................14

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
  344 F.3d 184 (2d Cir. 2003)................................................................................................23

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)................................................................................................14

*Ritani, LLC v. Aghjayan*,
  880 F. Supp. 2d 425 (S.D.N.Y. 2012)..................................................................................23

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999)................................................................................................14

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970)..............................................................................................15

*Sensormatic Electronics Corp. v. TAG Co. US, LLC*,
  632 F. Supp. 2d 1147 (S.D. Fla. 2008) ...............................................................................15

*Silvers v. Dis-Com Sec., Inc.*,
   403 So. 2d 1133 (Fla. 4th DCA 1981) ....................................................................24

*Sun Elastic Corp. v. O.B. Indus.*,
   603 So. 2d 516 (Fla. 3d DCA 1992) ......................................................................16

*Ticor Title Ins. Co. v. Cohen*,
   173 F.3d 63 (2d Cir. 1999)......................................................................................15

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
   60 F.3d 27 (2d Cir. 1995)........................................................................................15

*Universal Marine Med. Supply, Inc. v. Lovecchio*,
   8 F. Supp. 2d 214 (E.D.N.Y. 1998) .......................................................................19

*Wenner Media LLC v. N. & Shell N. Am. Ltd.*,
   No. 05 CIV. 1286 (CSH), 2005 WL 323727 (S.D.N.Y. Feb. 8, 2005) ..................14

**STATUTES**

Fla. Stat., §§ 688.001-688.009 ...........................................................................................18

Fla. Stat., § 688.002(1) .......................................................................................................18

Fla. Stat., § 688.002(2)(a),(b) ............................................................................................18

Fla. Stat., § 688.002(4) .......................................................................................................18

Fla. Stat., § 688.003(1) .......................................................................................................18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65........................................................................................................ passim

Fed. R. Civ. P. 65(c) ...........................................................................................................25

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff KLX Inc. ("KLX" or the "Company") respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction.

## PRELIMINARY STATEMENT

KLX is in need of injunctive relief and a temporary restraining order to preserve the status quo and to avoid the disclosure of its confidential, proprietary and trade secret information ("Confidential Information") to a competitor, or the public, by two former employees, Defendants Joan and David Nissen (the "Defendants" or the "Nissens").  KLX respectfully requests that this Court issue a Temporary Restraining Order ("TRO") and set a Preliminary Injunction hearing to occur on or before the expiration of the TRO, which enjoins and restrains the Nissens for a period of at least fourteen (14) days from the entry of the TRO, and until a trial on the merits after the Preliminary injunction hearing, from performing any of the following acts:

a.  retaining any secret, confidential, or proprietary information belonging to KLX that is in tangible form (including computer files, removable media "thumb drives," CDs, electronic files on removal media or in any other electronic form, and hard copy documents) and instead returning all such documents, materials, computer files and other data;

b.  using or causing to be used, or disclosing in any manner, any confidential and trade secret information of KLX;

c.  modifying, deleting, altering or destroying any of KLX's files, documents, materials, or data obtained or removed from KLX or reflecting information accessed at or obtained from KLX, including any confidential information, and documents or other evidence reflecting the removal, use or disclosure of any confidential information including but not limited to printed documents or data in any electronic format, however stored, including any type of computer, disk, storage device or otherwise, or destroying evidence of the accessing, transfer, copying, use or disclosure of such information; and

d.  soliciting, contacting, employing, proposing, discussing, executing, consummating any transactions with, or providing services to any KLX customer with whom KLX has an existing or prospective business relationship, including, but not limited to, Boeing, Middle River Aircraft Systems, and Meggitt PLC, based on their use, dissemination, disclosure, possession or access to KLX Confidential Information.

In this action, injunctive relief is necessary because Defendants are in possession of, and have used, and will continue to use KLX Confidential Information. Indeed, Defendants undeniably transferred Confidential Information to their personal e-mail accounts. Worse yet, Defendants likely did so with the intent to use this information for the benefit of their new employer—M3 Technologies LLC ("M3 Tech"), which is a KLX competitor—and to otherwise obtain an unlawful competitive advantage over KLX. Once this Confidential Information is disclosed to KLX's direct competitor M3 Tech—or to others—KLX will be harmed irreparably, as the loss of secrecy cannot be undone.

On April 9, 2015, KLX filed a Complaint for Injunctive Relief and Damages ("Complaint"), asserting claims against Defendants for: Breach of Contract, Misappropriation of Trade Secrets, Breach of Duty of Loyalty, and Injunctive Relief. But any relief this Court may ultimately grant at law is likely to come too late for KLX if injunctive relief is not ordered. The irreparable harm to KLX is significant, and the Company has no adequate remedy available at law. Indeed, if Defendants are permitted to retain the Confidential Information, KLX's reputation and goodwill will be threatened and damaged beyond repair with at least three key clients – Boeing, Middle River Aircraft Systems and Meggitt PLC. Further, as discussed *infra,* KLX will likely succeed on the merits of its claims for trade secret misappropriation, breach of contract and breach of duty of loyalty against Defendants. Alternatively, given the overwhelming amount of Confidential Information improperly transferred by Defendants, KLX raises sufficiently serious questions going to the merits, and the balance of hardships tips in its favor— which likewise supports the injunctive relief sought by this Motion. Defendants have little, if anything, to lose by this Court's provision of temporary relief to preserve the status quo (besides, of course, access to KLX's Confidential Information, which they unlawfully misappropriated).

KLX, on the other hand, stands to lose the secrecy of its Confidential Information, as well as customer goodwill, and its reputation in the Aerospace industry—for which money damages would be insufficient.

## STATEMENT OF FACTS

David Nissen and Joan Nissen previously worked for B/E Aerospace, Inc. ("B/E") until the recent spinoff of B/E's Consumable Management Segment ("CMS"), when they become employees of KLX. (Rob. Dec. at ¶ 2).[1]  Specifically, on December 15, 2014, B/E and KLX entered into a Separation and Distribution Agreement whereby B/E spun-off its CMS business and KLX, a new separate, publically traded company was formed. (*Id*. at ¶ 3).

Additionally, as the result of an Employee Matters Agreement entered into between B/E and KLX as part of the spinoff, the Nissens became employees of KLX and continued to work at KLX's Cornwall, New York location, where they previously worked for B/E.  (*Id*. at ¶ 4)**.** Pursuant to the Employee Matters agreement, B/E assigned to KLX all rights to enforce any obligations agreed to by the Nissens while at B/E, including: "all agreements containing restrictive covenants (including confidentiality, non-competition and non-solicitation provisions) between a member of the B/E Group and a KLX Employee, with such assignment to be effective as of the Distribution Date."  (*Id*. at ¶ 5).

David Nissen was employed by KLX as a Group Program Manager—a director level position—while Joan Nissen was a Senior Manager of Sales.  (*Id*. at ¶ 7).  The Nissens worked closely together while at KLX and are believed to have been married at one time. (*Id*)  By virtue of their respective roles, they managed three main Original Equipment Manufacturer ("OEM") market segments:  The Boeing Company IMM and EPP Programs ("Boeing"), Middle River

---

[1]	Citations to the April 9, 2015 Declaration of Charles Robinson appear hereinafter as (Rob Dec. at ¶ ___ ).

Aircraft Systems, a division of GE Aviation ("Middle River"), and Meggitt, PLC.  (*Id.*).  In the aggregate, these segments constitute a combined revenue in excess of $40 million for KLX's business.  (*Id.*).

KLX invested and continues to invest considerable resources to develop information, methods, and techniques to: (a) identify and negotiate advantageous business ventures with the Boeing, Middle River and Meggitt; (b) develop, maintain, and nurture business relationships with these and other entities; (c) learn Boeing, Middle River and Meggitt business and aerospace needs; (d) develop innovative solutions to satisfy those needs; and (e) set appropriate pricing to attract and maintain Boeing, Middle River and Meggitt projects.  (*Id*. at ¶ 8).

As the Group Program Manager, David Nissen was the face of KLX's Cornwall, New York Operations. Mr. Nissen had primary accountability for total sales revenue, profitability, customer requirement prioritization, customer relationship management, overall market segment and program management and performance for Boeing, Middle River and Meggitt. (*Id*. at ¶ 9). As the Senior Manager of Sales, Joan Nissen was responsible for the development and performance of all sales activities in the region, she managed a sales team and was expected to provide leadership towards the achievement of KLX's sales goals. (*Id*. at ¶ 11).  By virtue of their respective roles at the Company, the Nissens had access to trade secrets and proprietary information including vendor and supplier lists, product and component design specifications, KLX's pricing, margins, project specifications, and key Boeing, Middle River and Meggitt points of contact, as well as agreements between KLX, its clients and vendors.  (*Id*. at ¶ 13).   As the points of contact for Boeing, Middle River and Meggitt, the Nissens received access to both KLX and Boeing, Middle River and Meggitt confidential, proprietary, and trade secret information.  They received specialized training from both KLX and from Boeing, Middle River

and Meggitt (by virtue of their employment by KLX).  (*Id*. at ¶ 14).

  The most significant materials misappropriated by the Nissens (discussed below), are located in multi-tiered password protected databases and servers (henceforth KLX's "Electronically Stored Information Servers" or "ESI Servers").  (*Id*. at ¶ 15).  In most cases, access to the ESI Servers and these materials is granted only to KLX employees working on the account.  (*Id*.).  The ESI Servers are accessible solely via the Company intranet or secured Virtual Private Network ("VPN") tunneling.  Measures taken by KLX to protect the ESI Servers and proprietary information from unauthorized access include (but are not limited to):

  i. Allowing only key employees to have access to this information, and only if they are in a position to support a contract to ensure that requirements are fulfilled.  As such, only a small percentage of KLX employees have access to the information taken by the Nissens on these ESI Servers;

  ii. The ESI Servers are only available via the Company intranet or VPN after a user's credentials have been validated upon logging on to a local computer or KLX monitored device;

  iii. Password authentication is required to access the ESI Server via external sockets and SSL 128 bit encryption is employed;

  iv. Users are required to change their login credentials every 60-90 days.

  v. Passwords must contain a combination of alphanumeric characters and symbols.

(*Id*. at ¶ 16).

  The information, methods, and techniques developed by KLX, including but not limited to methods employed in developing pricing, identifying key contacts at Boeing, Middle River and Meggitt, and understanding each company's product mix, preferences, needs, and pricing structure, constitute highly confidential, proprietary, and/or trade secret information not generally known in the public domain.  (*Id*. at ¶ 17).

  The aforementioned information has significant economic value to KLX and is, or would be, of significant economic value to competitors in the industry.  (*Id*. at ¶ 18).

Accordingly, KLX takes reasonable measures to maintain the secrecy of its confidential, proprietary, and/or trade secret information, including password protection for access to all computer-based applications, physical security measures to protect hard files, firewalls, and by limiting access to confidential, proprietary, or trade secret information to only certain authorized users. (*Id*. at ¶ 19).

### A.    KLX's Business and Legitimate Business Interests

KLX Aerospace Solutions, the division of KLX for which the Nissens worked, is the world's leading distributor of aerospace fasteners and consumables and full-service provider of inventory management solutions for the commercial, business jet, and military markets worldwide. (*Id*. at ¶ 20). Through KLX's global facilities network and advanced information technology systems, the company offers unparalleled service to commercial airliners, business jet, and defense original equipment manufacturers (OEMs), airlines, maintenance, repair and overhaul (MRO) operators, and fixed based operators (FBOs). (*Id*. at ¶ 21). With a large and diverse global customer base seeking access to over one million part numbers, KLX serves as a distributor for every major aerospace fastener manufacturer. (*Id*.). The Company's system supports both internal distribution processes and part attributes, along with customer services, including Bin Management and Kitting solutions, which are unmatched in the industry. KLX serves virtually all of the world's airlines, aircraft manufacturers, leasing companies, and completion centers through direct sales and customer support organizations. (*Id*.).

KLX, and its predecessor B/E, has invested significant resources in establishing and growing its national and international CMS Business. (*Id*. at ¶ 22). As part of its growth, KLX expended considerable time, effort and resources in developing and maintaining proprietary and valuable information, including, but not limited to, vendor and supplier lists, product and component design specifications, KLX's pricing, margins, project specifications, and key

6

Boeing, Middle River and Meggitt points of contact, as well as agreements between KLX, its clients and vendors.  (*Id*.).  David and Joan Nissen had access to these trade secrets by virtue of their respective roles at KLX.  (*Id*. at ¶¶ 23-24).

**B.     The Nissens' Agreement to Maintain the Confidentiality of KLX's Proprietary and Trade Secret Information**

To protect its confidential, proprietary, and trade secret information and in furtherance of its legitimate business interests, KLX also requires the individuals it employs to agree to maintain the confidentiality of this information.  (*Id*. at ¶ 25).  When he first began his employment, David Nissen was required to sign a Proprietary Rights Agreement, which prohibited any direct or indirect disclosure of B/E's (now KLX's) proprietary and confidential information.  (*Id*. at ¶ 26).  Joan Nissen also executed the same agreement.  (*Id*. at ¶ 27) (hereinafter, the "PRA" or collectively, the "PRAs").

In their respective Agreements, the Nissens agreed "to maintain in confidence and…not disclose or use, either during or after the Agreement Period, any **Proprietary Information**." (*Id*. at ¶ 28) (emphasis added).  "Proprietary Information" as defined in the Agreements includes, but is not limited to the following:

A.    KLX's written materials;

B.    Names and information relating to customers and prospective customers of KLX and/or persons, firms, corporations or other entities with whom KLX has provided goods or services;

C.    The terms of various agreements between KLX and any third parties;

D.    Any data or database, trading algorithms or processes, or other information compiled by KLX;

E.    All policies, procedures, strategies and techniques regarding the services performed by KLX or regarding the training, marketing and sales of KLX, either oral or written;

    F.     Any other information, data, know-how or knowledge of a confidential or proprietary nature observed, used, received, conceived or developed by the Nissens in connection with their employment;

    G.    All non-public information regarding the amount and nature of the capital and assets owned or controlled by, or net worth of, KLX;

    H.    All discoveries, inventions, research, production processes, software, trademarks, etc., developed or learned by the Nissens while employed by KLX;

    **I.**    **Trade Secrets**.

(*Id*. at ¶ 29) (emphasis added).

By executing these Agreements, the Nissens also agreed not to remove any Proprietary Information from KLX without the Company's consent and to return all Proprietary Information prior to their separation of employment:

**<u>Use and Return of Proprietary Information and Trade Secrets:</u>**

(i) I agree that under no circumstance and at no time shall any of the Proprietary Information and Trade Secrets be taken from the Company's premises and that under no circumstances and at no time shall any of the Proprietary Information and Trade Secrets be duplicated, in whole or in part, without the express written permission of the Company, which permission may be granted or denied in the Company's sole and absolute discretion;

(ii) I agree that, upon termination of my employment (if applicable} and/or tenure as an independent contractor with the Company for any reason (regardless of whether or not the Company retains me as a consultant) or at any other time upon the Company's request, I shall return to Company, without retaining any copies, all Proprietary Information and Trade Secrets, as well as all other Company's documents and other materials, which are in my possession regardless of the form in which any such materials are kept;

(*Id*. at ¶ 30).

Additionally, the Nissens warranted and represented that they had no rights to any inventions or other confidential or proprietary information prior to their employment with KLX.  (*Id*. at ¶ 31). As such, any information or ideas conceived or learned by the Nissens in the course of their employment, including but not limited to, any inventions, know-how, strategies and related

activities were to remain the property of KLX, as outlined in the Proprietary Rights Agreement, which protects such information from disclosure.  (*Id*.).  Significantly, the Nissens also expressly acknowledged that the failure to adhere to their obligations regarding confidentiality and proprietary information would cause KLX irreparable harm:

> A breach of any of the promises or agreements contained herein **will result in irreparable and continuing damage to the Company** for which there will be no adequate remedy at law, and the Company shall be entitled to injunctive relief and/or a decree for specific performance, and such other relief as may be proper (including monetary damages, if appropriate).

*See* (Rob Dec. at Exhibits D and E) (emphasis added).

KLX/B/E also has a number of policies and procedures in place prohibiting the disclosure of its trade secrets and proprietary information, including but not limited to a Code of Business Conduct (which the Nissens initially received and acknowledged during their employment with B/E).  (*Id*. at ¶ 32).  The Code clearly explains that as a condition of employment, the Nissens were required to safeguard KLX-B/E Confidential Information, which included, but was not limited to "pricing, inventions, financial data, trade secrets and know-how, acquisition and divestiture opportunities, marketing and sales programs, research and development information and customer and supplier information," to wit:

> The Company's assets also include confidential and proprietary information relating to the present or planned business activities or assets of the Company that have not been released publicly by the Company.  **Confidential information includes, for example, pricing, inventions, financial data, trade secrets and know-how, acquisition and divestiture opportunities, marketing and sales programs, research and development information and customer and supplier information.**
>
> No employee should disclose the Company's confidential or proprietary information to anyone within or outside the Company unless the recipient legitimately needs the information to carry on his assigned responsibilities as an employee with the Company, or is an outsider who has been properly authorized by management to receive such information.

(*Id*.).

Without question, the Nissens knew of their obligations to KLX.

### C.     KLX discovers that the Nissens stole its confidential information and trade secrets.

In a coordinated effort, the Nissens suddenly resigned their employment at KLX on February 16, 2015, by separate emails sent to their supervisor, Chuck Robinson, KLX's Vice President of Sales Americas, Asia and Major Programs.  (*Id*. at ¶ 33). The emails, which were nearly identical, were sent within one (1) minute of each other and provided less than two weeks' notice of their intended final day of employment on February 27, 2015.  (*Id*.).

Soon after receiving notice of the Nissens' resignations, KLX learned that they had purportedly accepted offers of employment from M3 Tech.    (*Id*. at ¶ 34).  The Nissens' new employment with M3 Tech was a red flag, as M3 Tech was a competitor of KLX that could use the confidential and trade secret information about KLX's part pricing, quantity, vendor and distribution channels to compete with KLX and undercut the Company in competitive bidding process.  (*Id*. at ¶ 35).  Given that the Nissens had unfettered access to this information by virtue of their roles at the Company, KLX reviewed their e-mails.  (*Id*. at ¶ 36).  This review uncovered evidence suggesting that the Nissens planned the misappropriation of trade secrets to occur during the period leading up to their anticipated last day of his employment on February 27, 2015.  (*Id*. at ¶ 38).

Specifically, KLX determined that, as early as February 3, 2015, the Nissens began forwarding highly confidential e-mails and documents to their personal email addresses: **nissman624@aol.com** and **justj412@aol.com**. (*Id*. at ¶ 39).  As set forth more fully in the Complaint and Declaration, the Nissens sent KLX documents and data (and likely more), which had been developed through considerable effort and expense and would enable a competitor,

including M3 Tech, to win contracts against KLX by undercutting its pricing.  These documents also included, vendor lists, cost and volume information, supplier information and high-level customer contacts.  An accounting to date of this conduct follows:

**David Nissen**:

- **February 3, 2015, at 10:42 AM**: David Nissen forwarded himself an email containing an Excel Spreadsheet and .pdf file with highly confidential competitive market information regarding KLX's relationship with Boeing. Specifically, the .pdf file which was entitled, "Amendment_A012_65147-0379 dated 10-28-2014.pdf" was a confidential, proprietary and trade secret document containing the "Special Business Provisions…Between the Boeing Company and [KLX]" which included, among other things, updated Work Statements, Pricing provisions and Emergent Procurement Program ("EPP") Requirements.  It also contained specifics regarding part prices and service fees, which are subject to a Non-Disclosure Agreement between Boeing and KLX.  With regard to the Excel Spreadsheet, that document contained part numbers, supplier information, UOP and pricing information that accompanies the agreement.  (*Id*. at ¶ 40).

- **February 5, 2015 at 1:32 PM:** David Nissen forwarded to himself an Excel Spreadsheet with highly confidential competitive market information regarding Interturbine, a division of KLX.  (*Id*. at ¶ 41).

- **February 5, 2015**, David Nissen forwarded to himself an Excel Spreadsheet and accompanying email which included competitive pricing information and pricing structures used to pitch and evaluate deals for Boeing IMM.  These particular documents were used to make a "refreshed" offer to Boeing IMM in or around January 2015 and contained information, including but not limited to KLX's costs and resale price suggestions; which are based on KLX's proprietary regional pricing model, historical sales price data and pricing per KLX's Unit of Measure ("UOM").  (*Id*. at ¶ 42).

- **February 10, 2015, at 9:31 AM**: David Nissen forwarded to himself an Excel Spreadsheet entitled "Master_Exhibit D-11142014_validation copy" and accompanying email which included KLX's entire parts list for quoted and purchased materials for GE Aviation/Middle River.  The spreadsheet included Line Number information, Prior Part Numbers, Customer Reference Numbers, Invoiced Parts Numbers, Certified Part Numbers, Quantities, Contract Prices, Estimated Annual Usage, and Actual Annual Usage.  The email also included a chain of correspondence between B/E-KLX employees and General Electric Aviation employees discussing, *inter alia,* purchase requirements and lead time availability with target dates extending through October 2015.  (*Id*. at ¶ 43).

11

- **February 17, 2015 at 2:19 PM**: David Nissen forwarded to himself two Excel Spreadsheets entitled "747 Alum Fasteners" and "Shuff 747 Aluminum." These documents contain a list of parts quoted to Boeing in the IMM and EPP programs and applies to customers who support airframes and thrust reversers manufactured by Middle River Aviation—two accounts which the Nissens serviced while at KLX. (*Id.* at ¶ 44).

- **February 18, 2015 at 12:52 P.M.**: David Nissen forwarded to himself an Excel Spreadsheet entitled "invoice analysis" and e-mails containing a list of parts relative to quoting a Boeing IMM contract. This Excel Spreadsheet contained part numbers, quotes, purchase locations and manufacturing information.. (*Id.* at ¶ 46).

- **February 18, 2015 at 12:53 P.M.**: David Nissen forwarded to himself an e-mail entitled, "Early February SIA EPP Parts to Transition." This document contained an Excel style spreadsheet with information regarding part, quantity, pricing and transition date information for an early February 2015 SIA EPP parts to transition. (*Id.* at ¶ 47).

- **February 18, 2015 at 12:57 P.M.**: David Nissen forwarded himself an email containing an Excel Spreadsheet including pricing, quantity and cost information relative to parts to support Boeing customers. (*Id.* at ¶ 48).

- **February 18, 2015 at 2:16 PM**: David Nissen forwarded to himself an e-mail string entitled "Validation Quote for PCA H53 Nacelles." This email contained a confidential and proprietary quote sent by GKN Aerospace (a large airframe subcontractor) to B/E-KLX employees with highly confidential, proprietary, and trade secret information including, but not limited to, part numbers, quantity of aircraft, purchase orders, pricing information, and projected requirements **through 2019.** David Nissen forwarded this information to his personal account despite knowing that doing so could violate the **Arms Export Control Act and/or Export Administration Act.** (*Id.* at ¶ 49-50).

- **February 19, 2015 at 10:28 and 10:29 A.M.**, **and again on February 20, 2015 at 2:56 P.M.**: David Nissen forwarded himself three spreadsheets and a string of emails regarding parts manufactured and sold by KLX for the Airbus A320. (*Id.* at ¶ 51).

- **February 19, 2015 at 11:28 A.M.**: David Nissen forwarded himself an email containing pricing, quantity and cost information relative to parts to support the Boeing 747 aircraft. (*Id.* at ¶ 53).

- **February 20, 2015, at 10:42 AM and again at 11:35 AM**: David Nissen forwarded to himself two emails containing .txt files entitled "boeing.txt" and "imm.txt," respectively. Of the materials misappropriated by David Nissen these items were two of the most alarming. The files David Nissen forwarded himself

12

on February 20, 2015, at 10:42 AM and again at 11:35 AM contained KLX's "Playbook" for the Boeing EPP and Boing IMM accounts.  They included over 50,000 line entries of information regarding each part sold by B/E-KLX beginning in 2012 and contained quintessential trade secret information including: part **numbers, quantities purchased, total price, financial cost information, profit to B/E-KLX, profit margin, booking dates, CNV pricing, and aggregated information for the <u>entire Boeing EPP and Boeing IMM accounts.</u>**  (*Id*. at ¶ 54).

- **February 20, 2015 at 2:56 P.M.**: David Nissen forwarded himself a document containing a quote by Esterline Engineered Materials.  This document contained quantity and pricing information for Middle River.  The information contained in these documents was compiled through extraordinary effort and expense of KLX and would allow a competitor to win a contract by undercutting KLX's pricing in the market.  (*Id*. at ¶ 55).

**Joan Nissen:**
- **February 12, 2015 at 11:52 A.M.**: Joan Nissen forwarded herself and email containing information regarding issues with Boeing inventory and discussing various points of contact at the company.  (*Id*. at ¶ 61).

- **February 13, 2015 at 12:31 P.M.**: Joan Nissen forwarded herself a document containing a list of KLX salespeople, the customer accounts they managed, and the types, quantity and value of parts needed by each customer.  This spreadsheet essentially contained KLX's playbook for its major accounts, the customer accounts they managed, and the types, quality and value of parts needed by each customer.  (*Id*. at ¶ 62).

The Nissens forwarded KLX's confidential information to their personal accounts for no legitimate reason other than to transfer this information to their new employer, KLX's competitor - M3 Tech, or otherwise unlawfully attempt to obtain a competitive advantage over KLX.

<u>**ARGUMENT**</u>

## I.  **LEGAL STANDARD FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

In the Second Circuit, "[a] party seeking a preliminary injunction must establish that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the

moving party." *Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Wenner Media LLC v. N. & Shell N. Am. Ltd.*, No. 05 CIV. 1286 (CSH), 2005 WL 323727, at *3 (S.D.N.Y. Feb. 8, 2005).

While the PRAs contain a Florida choice-of-law provision, Second Circuit case law controls whether this Court should grant a preliminary injunction and/or temporary restraining order, both of which are a question of federal procedural law. *See Leibowitz v. Aternity, Inc.*, No. 10 CV 2289 (ADS), 2010 WL 2803979, at *19 (E.D.N.Y. July 14, 2010). In any event, Florida and Eleventh Circuit law are in substantial accord with New York and Second Circuit law on the issues discussed herein. Indeed, under both standards, Plaintiff easily meets the threshold necessary to satisfy the requirements for the issuance of a preliminary injunction and/or a temporary restraining order.

### A.     Absent Injunctive Relief, KLX Will Suffer Irreparable Harm

The first prong of this inquiry – whether KLX stands to suffer irreparable harm without injunctive relief – is the most important prerequisite for a preliminary injunction. *See Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). To satisfy this requirement, "a movant need not demonstrate its certainty." *Wenner Media LLC*, No. 05 CIV. 1286 (CSH), 2005 WL 323727, at *3. "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative  . . . and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (internal citations omitted). KLX easily meets this threshold.

Preliminarily, the Nissens acknowledged in the PRAs, among other things, that KLX would suffer "irreparable harm" if they failed to comply with the PRAs. The importance of that acknowledgment in the agreements that Defendants cannot be overlooked, as it is entitled to

14

significant weight and fully supports an award of injunctive relief.  *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[T]he employment contract sought to be enforced concedes that in the event of Cohen's breach . . . , Ticor shall be entitled to injunctive relief, because it would cause irreparable injury."); *see also Int'l Bus. Machines Corp. v. Papermaster*, No. 08-CV-9078(KMK), 2008 WL 4974508, at *9 (S.D.N.Y. Nov. 21, 2008).

Furthermore, the Confidential Information taken by the Nissens threatens KLX's reputation, relationship and goodwill with three key clients – Boeing, Middle River and Meggitt—as well as its stature in the Aerospace industry at large.  Irreparable harm exists where the "viability of the plaintiff's business . . . or substantial losses beyond those" of  a particular product "have been threatened."  *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("[T]he right to continue a business   . . . is not measurable entirely in monetary terms.").  Disclosure of KLX's confidential part and pricing information for particular clients threatens to the years of resources and trust KLX built with its clients.

Moreover, courts within the Second Circuit regularly hold that where, as here, a plaintiff is threatened with trade secret misappropriation, a rebuttable presumption of irreparable harm may be applied.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) (noting rebuttable presumption of irreparable harm applied "in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets *will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets*.") (emphasis added); *accord Sensormatic Electronics Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1186 (S.D. Fla. 2008).  In fact, the Second Circuit observed that misappropriation of trade secrets is exactly the type of harm which cannot fully be compensated with money damages because "[a] trade

15

secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 47 (2d Cir. 1999); *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (observing that "it would be very difficult to calculate the monetary damages that would successfully redress the loss" of misappropriated trade secrets).[2]

Under the present circumstances, KLX faces the imminent and real threat of likely, if not certain, irreparable harm.  Defendants accepted offers of employment from a direct competitor of KLX, Inc., M3 Tech.  (Rob Dec. at ¶ 34).   Moreover, Defendants misappropriated and almost certainly used (and will continue to use) KLX's confidential and proprietary information to KLX's detriment.   Indeed, a review of Defendants' email accounts while employed at KLX confirmed that they sent sensitive information regarding high-level customer contacts, part designs, and pricing methodologies and arrangements to their personal e-mail accounts.  (*Id.* at ¶¶ 36-64).   KLX now faces the immediate threat of having Defendants disclose this information to its competitor.   And, as explained in greater detail below, the information, documents and data stolen by Defendants unquestionably constitute protected trade secrets, which, again, cannot be fully remedied by an award of money damages.

The facts and circumstances in *Leibowitz v. Aternity, Inc.*, No. 10 CV 2289 (ADS), 2010 WL 2803979 (E.D.N.Y. July 14, 2010) are analogous the situation at hand and therefore instructive.  In *Leibowitz*, the defendant-employee, who was subject to a confidentiality and non-compete agreement, "had access to confidential customer contact and pricing information as well

---

[2]     *Accord Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 156 (Fla. 4th DCA 2006) (temporary injunction warranted where plaintiff presented evidence that a former employee misappropriated sensitive information about the company's business operations that could give a competitor an advantage); *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1084 (Fla. 4th DCA 2006) ("[A]n injury is irreparable where the damage is estimable only by conjecture, and not by any accurate standard.") (citing *Sun Elastic Corp. v. O.B. Indus.*, 603 So. 2d 516, 517 n.3 (Fla. 3d DCA 1992) (noting that "irreparable" is that which is not capable of being adequately repaired or redressed in a court of law by an award of money damages)).

as [the plaintiff company's] marketing plans." *Id* at *20.  Prior to leaving the plaintiff-company (and knowing he was leaving), "[the defendant] e-mailed various confidential documents and trade secrets to his personal address." *Id*.  The Court granted the plaintiff's application for a preliminary injunction and found it "clear that [the plaintiff company] would be irreparably harmed if [defendant] used this information to gain an advantage in soliciting [the plaintiff company's] customers or to disparage the company and its officers." *Id*.

Here, before leaving KLX (and with full knowledge that they were headed to a direct competitor), Defendants schemed simultaneous resignations as part of an effort to misappropriate trade secrets – which are of a similar nature to those in *Leibowitz* – through the improper means of abusing their position and confidential relationship with their employer.  The Nissens, like the defendant in *Leibowitz*, also surreptitiously emailed that information to their personal accounts. These actions, as in *Leibowitz*, were in direct breach of the Agreement.  Accordingly, KLX – just like the plaintiff in *Leibowitz* – will undoubtedly suffer irreparable harm without injunctive relief.

## B.   KLX is Likely to Prevail on the Merits

KLX filed a Complaint which asserts claims against Defendants for Breach of Contract (Count I); Misappropriation of Trade Secrets (Count II); Breach of the Duty of Loyalty (Count III); and a Permanent Injunction (Count IV).  KLX seeks immediate relief in connection with the misappropriation of trade secrets, breach of contract, and breach of duty of loyalty claims.  KLX will undoubtedly prevail on these claims.

### (1)   Defendants Misappropriated Trade Secrets

In order to prevail on a New York common law claim for misappropriation of trade secrets, a plaintiff must demonstrate: (1) it possesses a trade secret; and (2) the defendant is using that trade secret in "breach of an agreement, a confidential relationship, or as a result of

discovery by improper means." *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 407 (1993).[3]

> **(a)**   The Confidential and Proprietary Information Stolen by Defendants are Trade Secrets

Under New York law, "a trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999). When determining whether information constitutes a protectable trade secret, New York courts consider six factors – each of which is persuasive – to be relevant to this assessment:

> (1)  the extent to which the information is known outside of [the Company's] business; (2) the extent to which it is known by employees and others involved in [the Company's] business; (3) the extent of measures taken by [the Company] to guard the secrecy of the information; (4) the value of the information to [the Company] and to [its] competitors; (5) the amount of effort or money expended by [the Company] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Cross Media Mktg. Corp.*, No. 06 CIV. 4228 (MBM), 2006 WL 2337177, at *4 (S.D.N.Y. Aug. 11, 2006).[4]  A "trade secret can exist in a combination of characteristics and components, each of which, by itself is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.*

---

[3]      The Florida Uniform Trade Secrets Act ("FUTSA"), §§ 688.001-688.009, Florida Statutes, authorizes a court to enjoin "actual or threatened misappropriation" of a trade secret.  Fla. Stat., § 688.003(1). "Misappropriation" is defined as:  1) acquisition of a trade secret of another by a person who knows that the trade secret was acquired by "improper means;" or 2) disclosure or use of a trade secret of another without consent by a person who used "improper means" to acquire the trade secret or by a person who acquired the trade secret pursuant to a duty to maintain its secrecy.  Fla. Stat., § 688.002(2)(a),(b).   "Improper means" includes theft, misrepresentation, and breach or inducement of a breach of a duty to maintain secrecy.  Fla. Stat., § 688.002(1).

[4]      Similarly, under Florida law, a trade secret is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Fla. Stat., § 688.002(4).

As explained in greater detail below, most, if not all, of the Confidential Information Defendants stole and surreptitiously emailed to their personal accounts bears these hallmarks of a protected trade secret.  The information is not known outside of KLX's business.  Even internally, KLX implemented numerous safeguards to keep the information secret, including, but not limited to, password protection for access to all computer-based applications, physical security measures to protect hard files, firewalls, and provided access to the information solely on a *need-to-know* basis.  (Rob. Dec. at ¶¶ 15-19).   The information is undeniably valuable – both to KLX and its competitors, including M3 Tech – as it directly implicates $40 million worth of current KLX business, as well as an unascertainable amount of potentially lost business,  and would enable competitors to undercut KLX's prices in competitive bids and negotiations.  (*Id.* at ¶ 35).  Moreover, due to the efforts KLX takes to safeguard, protect and cultivate its Confidential Information, such information could not, through proper means, be acquired or duplicated by others, including M3 Tech or any other competitors.

KLX's pricing, profit margin, supplier, vendor and part information, which Defendants stole, are undeniably protected as trade secrets under New York law.  *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) (observing that trade secrets can "relate to" formulas included in a "price list or catalogue."); *Medtech Prods. Inc. v. Ranir, LLC,* 596 F. Supp. 2d 778, 804 (S.D.N.Y. 2008) (supplier lists and pricing information are trade secrets); *Frantic, LLC v. Konfino*, No. 13 CIV. 4516 AT, 2013 WL 5870211, at *4 (S.D.N.Y. Oct. 30, 2013) (finding that "customer lists, **pricing information**, client contact information, and customer needs and preferences" may qualify as trade secrets.) (emphasis added); *Universal Marine Med. Supply, Inc. v. Lovecchio*, 8 F. Supp. 2d 214, 222 (E.D.N.Y. 1998) (allegations involving theft of "customer list, corporate operating procedures, **price catalogs, [and] vendor contract**"

sufficient to state cause of action for misappropriation of trade secrets) (emphasis added); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532-33 (S.D.N.Y. 2004) ("Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences."); *Gen. Elec. Co. v. Macejka*, 252 A.D.2d 700, 701, 675 N.Y.S.2d 420, 421 (3d Dep't 1998) (observing profit margin information is a trade secret); *Ikon Office Solutions, Inc. v. Leichtnam*, No. 02-CV-0721E(SC), 2003 WL 251954 (W.D.N.Y. Jan. 3, 2003).

Similarly, both federal and state courts in New York have routinely found that that companies' customer information, including customer lists, qualifies as protected trade secrets. To that end, "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (quoting *Defiance Button Mach. Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985)). Here, Defendants misappropriated customer information that included high-level points of contact for essential customers, including Boeing, Middle River, and Meggitt PLC. Notably, the Second Circuit has expressly held that a customer list containing the "*identities of individual contact people*" qualifies as a protected trade secret. *N. Atl. Instruments, Inc.*, 188 F.3d at 45 (emphasis in original) (noting that defendant employee had no explanation for printing out client list in upholding preliminary injunction).[5]

---

[5]     This information qualifies for trade secret protection under Florida and Eleventh Circuit law as well. *See In Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, 2001 WL 1200656 (S.D. Fla. 2001) (holding customer information maintained on a laptop computer which contained the names, addresses, phone numbers and account information for clients constituted a trade secret, even though the information was available to anyone in that branch office); *Four Seasons Hotels & Resorts v. Consorcio Barr*, 267 F. Supp. 2d 1268, 1325 (S.D. Fla. 2003), *aff'd in part, rev. in part*, 138 Fed. Appx. 297 (11th Cir. 2005) (determining detailed customer profiles collected and

Accordingly, federal and state courts have routinely and overwhelmingly protected information nearly identical to the Confidential Information at issue here.

> **(b)**     <u>Defendants Misappropriated KLX's Trade Secrets in Direct Violation of the PRAs and their Positions of Trust and Confidence with KLX</u>

As described above, a requirement of a claim for misappropriation of trade secrets is that a defendant be in possession of trade secret in violation of, *inter alia*, an agreement or a confidential relationship.  In the PRAs, Defendants expressly acknowledged that the following information was proprietary and agreed to maintain its confidentiality and secrecy for that reason:

A.    KLX's written materials;

B.    Names and information relating to customers and prospective customers of KLX and/or persons, firms, corporations or other entities with whom KLX has provided goods or services;

C.    The terms of various agreements between KLX and any third parties;

D.    Any data or database, trading algorithms or processes, or other information compiled by KLX;

E.    All policies, procedures, strategies and techniques regarding the services performed by KLX or regarding the training, marketing and sales of KLX, either oral or written;

F.    Any other information, data, know-how or knowledge of a confidential or proprietary nature observed, used, received, conceived or developed by the Nissens in connection with their employment;

G.    All non-public information regarding the amount and nature of the capital and assets owned or controlled by, or net worth of, KLX;

H.    All discoveries, inventions, research, production processes, software, trademarks, etc., developed or learned by the Nissens while employed by KLX

**I.**    **Trade Secrets.**

---

maintained by the luxury hotel chain qualified as trade secrets where information was generally accessible to employees of chain, but not available outside of the business).

Under any standard, Defendants have misappropriated these trade secrets in willful breach of the express terms of the PRAs.  Indeed, there is no plausible explanation – apart from their intent to misappropriate the exact documents and information contemplated by the PRAs – for the Nissens to forward KLX's confidential and proprietary information to their personal email accounts.  *See N. Atl. Instruments, Inc.*, 188 F.3d at  2 (noting that defendant-employee had no explanation for printing out client list in upholding preliminary injunction).  Accordingly, Defendants are in possession of Plaintiff's trade secrets in breach of a valid and enforceable agreement.

Moreover, as former employees who managed and/or serviced accounts amounting to approximately $40 Million worth of KLX's business, Defendants were part of a limited group of people who had access to the Confidential Information which they stole.  Defendants' use of their privileges of their positions undoubtedly constitutes a bad faith violation of their confidential relationship with KLX.

### (2)        Defendants Breached the PRAs

"To state a claim for breach of contract under New York law, a plaintiff must plead "'(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Liddle & Robinson, LLP v. Garrett*, 720 F. Supp. 2d 417, 424 (S.D.N.Y. 2010). [6]  As set forth above, the Nissens entered into a valid contract governing KLX's proprietary information (the PRAs) and are in continued breach of those contractual obligations.  KLX, at all times, performed its obligations under the PRAs by employing the Nissens.  The PRAs also unequivocally provide that any breach thereof will cause KLX, *inter alia*, irreparable harm and

---

[6]        *Accord NPA Assocs., LLC v. Lakeside Portfolio Mgmt., LLC*, No. 12-23930-CIV, 2014 WL 714812, at *4 (S.D. Fla. Feb. 22, 2014). ("To state a cause of action for breach of contract under Florida law, a Plaintiff must allege (1) a valid contract, (2) a material breach of the contract, and (3) damages resulting from the breach.").

damages.  And, in any event, KLX has suffered damages by Defendants' breach, given that Defendants' breach implicates the business of three of KLX's largest and most significant clients.

### (3)    Defendants Breached Their Duty of Loyalty to KLX

"Under New York law, an employee is obligated to be loyal to his employer" and is prohibited "'from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'"  *Ritani, LLC v. Aghjayan,* 880 F. Supp. 2d 425, 454 (S.D.N.Y. 2012) (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)).  As such all employees – even those not bound by restrictive covenants (as were the Defendants here) – "still have a duty of loyalty to their employer."  *Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 312 (N.D.N.Y. 2007).

Defendants breached their duty by stealing the Confidential Information with the intent to bring it to a direct competitor of KLX.  *See Fairfield Fin. Mortgage Grp., Inc. v. Luca*, No. 06-CV-5962 (JS) (WDW), 2014 WL 4638950, at *13 (E.D.N.Y. Sept. 16, 2014) ("A breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity.") (internal citations and quotations omitted).  Accordingly, Plaintiff is likely to prevail on its claim for breach of the duty of loyalty against Defendants.

### C.    Alternatively, KLX Raises Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Tips in its Favor

As set forth above, KLX has demonstrated that it is entitled to an order preliminarily enjoining and/or temporarily restraining Defendants because (1) KLX stands to suffer irreparable

harm; and (2) KLX is likely to prevail on the merits of its claims for misappropriation of trade secrets and breach of contract.

Even if this Court were not satisfied that KLX is likely to prevail on the merits, KLX has, at a minimum, raised sufficiently serious questions going to the merits of the dispute—which likewise supports the entry of injunctive relief.  Preliminary injunctive relief is appropriate because there is no doubt that the balance of the hardships tips decidedly in KLX's favor. *See Estee Lauder*, 420 F. Supp. 2d at 182 (internal citations omitted).

Additionally, Florida and Eleventh Circuit law requires that the issuance of a preliminary injunction serve the public interest.  Florida courts have recognized that the public remains entitled to rely on certainty in contracting and commercial development depends, in part, on the ability of a company to protect its trade secrets and other proprietary and confidential information, as well as its contractual expectation that such information would not be disclosed to third parties. *See Hatfield*, 939 So. 2d at 158 (noting that the "existence of Florida's trade secret statute illustrates our state's interest in protecting businesses from theft of confidential information."); *Silvers v. Dis-Com Sec., Inc.*, 403 So. 2d 1133, 1137 (Fla. 4th DCA 1981) ("[i]f contracts are to have any viability at all, there must be some means of meaningful enforcement available from the courts ... [s]ociety needs assurance that written contracts will not follow in the footsteps of the 'gentlemen's agreement' and become extinct.") (overruled on other grounds).

Here, KLX needs the Court's intervention to protect against any further use or disclosure of its confidential and proprietary information and trade secrets, the harm of which has been exacerbated by the Nissens' acceptance of an offer of employment with M3 Tech. Thus, an injunction would serve the public's interest in avoiding improper use or disclosure of sensitive information.

**D.      No or Only a Nominal Bond Should Be Required**

Although Rule 65(c) requires a bond to support issuance of a preliminary injunction or temporary restraining order, the bond required, if any, should be nominal.  It is beyond dispute that: (1) Defendants emailed KLX's Confidential Information to their personal email accounts prior to their departure to work for a competitor; and (2) the Nissens had no right to such documents and information.  The requested relief would only protect KLX's rights and would in no way harm Defendants.  Accordingly, KLX submits that the no bond should be required.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests this Court enter a preliminary injunction and/or temporary restraining order against Defendants and grant any other relief this Court deems just and reasonable.

Respectfully submitted,

Dated: April 10, 2015

AKERMAN LLP
666 Fifth Avenue
New York, New York 10103
telephone: (212) 880-3800
facsimile: (212) 880-8965


/s/ Scott M. Kessler
Michael C. Marsh
Scott M. Kessler
Christopher R. Lepore

ATTORNEYS FOR PLAINTIFF KLX INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2015 a true and correct copy of Plaintiff KLX Inc.'s Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction was served on Defendants David and Joan Nissen's counsel, Norman Cerullo, via electronic mail (ncerullo@rmfpc.com) and on April 10, 2015 via electronic filing.

/s Christopher R. Lepore, Esq.<br>
Christopher R. Lepore, Esq.